No. 105,923

In the Matter of DAVID F. HOLMES, *Respondent*.

(264 P.3d 423)

Opinion filed October 21, 2011.

*Kate F. Baird*, Deputy Disciplinary Administrator, argued the cause, and *Stanton A. Hazlett*, Disciplinary Administrator, was with her on the formal complaint for the petitioner.

*John J. Ambrosio*, of Ambrosio & Ambrosio, Chtd., Topeka, argued the cause, and *David F. Holmes*, respondent, argued the cause pro se.

*Per Curiam*: This is an original proceeding in discipline filed by the office of the Disciplinary Administrator against the respondent, David F. Holmes, of Hutchinson, an attorney admitted to the practice of law in Kansas in 1985.

On November 29, 2010, the office of the Disciplinary Administrator filed a formal complaint against the respondent alleging violations of the Kansas Rules of Professional Conduct (KRPC). The respondent filed an answer on December 14, 2010. A hearing was held on the complaint before a panel of the Kansas Board for Discipline of Attorneys on January 26, 2011, where the respondent was personally present and was represented by counsel. The hearing panel determined that respondent violated KRPC 1.3 (2010 Kan. Ct. R. Annot. 422) (diligence); 1.5 (2010 Kan. Ct. R. Annot. 458) (fees); 1.15(a) and (d) (2010 Kan. Ct. R. Annot. 505) (safekeeping property); 3.2 (2010 Kan. Ct. R. Annot. 539) (expediting litigation); and 8.4(c) and (g) (2010 Kan. Ct. R. Annot. 603) (engaging in conduct involving misrepresentation and reflecting on lawyer's fitness to practice law).

Upon conclusion of the hearing, the panel made the following findings of fact and conclusions of law, together with its recommendation to this court:

### "FINDINGS OF FACT

. . . .

"2. The Respondent has an attorney trust account, an attorney operating account (account number ending in 6695), and a personal checking account (account number ending in 0048).

"DA10865—Complaint of Glenn and Suzan Koster

"3.   Suzan Duncan, later known as Suzan Koster, a resident of Harvey County, Kansas, retained the Respondent in the fall of 2008 to represent her in an uncontested divorce action. Ms. Duncan's estranged husband resided in Leavenworth County, Kansas. She agreed to pay the Respondent $1,500 for the representation. Ms. Duncan paid the Respondent $750 and agreed to pay the balance. Ms. Duncan advised the Respondent that she was anxious to complete the divorce proceeding as she intended to marry Glenn Koster.

"4.   Mr. Koster was also in the process of getting divorced. In fact, the Respondent represented Mr. Koster's estranged wife in their uncontested divorce action. Mr. Koster agreed to pay the Respondent's fees associated with his divorce.

"5.   In February, 2009, the Respondent informed Ms. Duncan that the attorney fees would be $1,750 rather than $1,500. Ms. Duncan agreed to pay the fees, but requested an itemized statement. Eventually, in June, 2009, after significant personal difficulties, the Respondent provided Ms. Duncan with an itemized statement. [Footnote: On February 19, 2009, an armed gunman entered the Respondent's law office, held his staff and other occupants hostage, and engaged in a stand-off for some period of time. After the staff and other occupants were allowed to leave the Respondent's office, law enforcement officers launched tear gas bombs into the Respondent's law office, causing the gunman to leave the office and extensive damage to the Respondent's office and files. The Respondent relocated his office to temporary space close by. On March 25, 2009, the building which included the Respondent's temporary office burned. Again, the Respondent's office and files suffered extensive damage.]

"6.   Ms. Duncan failed to pay the balance of the attorneys fees. Thereafter, on August 20, 2009, the Respondent filed suit against Ms. Duncan to recover $1,250 in unpaid legal fees. Given that Ms. Duncan previously paid $750, because the Respondent alleged that Ms. Duncan continued to owe $1,250, the Respondent must have increased his fee to a total of $2,000.

"7.   On August 25, 2009, after the suit had been filed, Ms. Duncan filed a complaint against the Respondent with the Disciplinary Administrator's office.

"8.   The court scheduled a trial regarding the Respondent's action to recover the unpaid attorneys fees from Ms. Duncan for December 9, 2009. On that day, prior to the beginning of the trial, Ms. Duncan and the Respondent reached a settlement. Ms. Duncan agreed to pay the Respondent a total of $650, over a period of four months at a rate of $162.50 per month. The Respondent agreed to accept $650 to satisfy Ms. Duncan's obligation. The settlement agreement was not reduced to writing.

"9.   The following day, on December 10, 2009, Ms. Duncan wrote to the Respondent memorializing her understanding of their agreement. Ms. Duncan's letter provides as follows:

'According to our discussions yesterday before our scheduled court appearance, I agreed to pay your office a sum of $650 to settle the case

between us. This amount will be made in four equal installments of $162.50. These payments will be made on the first business day following the 16th of the month, commencing on February 16, 2010 and continuing through May 16, 2010.

'Should you have any questions, my address is listed above. My phone numbers . . . . My work number is . . . , but please refrain from calling me at work.'

At the hearing on this matter, Ms. Duncan testified that the Respondent agreed to allow her to begin payments on the judgment in February, 2010, because Mr. Koster would have the attorneys fees associated with his divorce paid off with his January, 2010, payment. Ms. Duncan was concerned that they would be unable to make a 'double' payment to the Respondent in January, 2010.

"10. The Respondent understood that Ms. Duncan's payments were to begin in January, 2010. However, the Respondent did not respond to Ms. Duncan's letter nor did he take any action to memorialize his understanding of their agreement.

"11. On December 14, 2009, the court entered a journal entry of judgment, prepared by the Respondent and approved by Ms. Duncan. The court entered judgment against Ms. Duncan in the amount of $650. The journal entry of judgment did not include the details of the settlement agreement regarding the monthly payment plan.

"12. Pursuant to Ms. Duncan's understanding of the agreement, which the Respondent failed to dispute, Ms. Duncan was not required to make a payment on the judgment until February, 2009. Despite that, on January 27, 2010, the Respondent filed a request for garnishment. Ms. Duncan was employed by the bank which held her accounts. On February 8, 2010, the order of garnishment was served on Ms. Duncan and on her place of employment, Burrton Bank. Ms. Duncan was humiliated at work by the service of the order of garnishment. Despite the financial strain it caused, Ms. Duncan immediately paid the judgment in full. The Respondent prepared and filed a release of garnishment and a satisfaction of judgment.

"DA10933—Complaint of Elizabeth Bradshaw (Kiraly Matter)

"13. On January 8, 2008, Jolan Kiraly died testate, leaving nine adult children heirs, including Elizabeth Bradshaw, Ted Kiraly, Steve Kiraly, Maria Wolfe, Joan Shelton, Patrik Kiraly, Laz Kiraly, John Kiraly, and Lisa Hayes. Additionally, Mrs. Kiraly specifically devised her real property to her minor grandson Michael Kiraly. Mrs. Kiraly left the rest of her estate to her nine children. Mrs. Kiraly nominated her daughter, Lisa Hayes, to serve as the executor of her estate.

"14. On January 15, 2008, Ms. Hayes retained the Respondent to probate her mother's estate. Ms. Hayes paid the Respondent a $2,500 'non-refundable retainer.' Without earning the fee, the Respondent deposited the $2,500 into his operating account. The Respondent commingled the unearned attorneys fees with his own money.

"15.  On March 18, 2008, the Respondent filed a petition for probate with the Reno County District Court, case number 08CR36.

"16.  On April 23, 2008, the Respondent provided the court with an order appointing an administrator. And, as a result, letters of administration were issued. Lisa Hayes, nominated as executor in her mother's will, was appointed as the administrator, although she was actually acting as an executor, not an administrator.

"17.  Also, on April 23, 2008, the court advised the Respondent that he would need to file a conservatorship because Mrs. Kiraly left real property to her minor grandson. For months, the Respondent took no recorded action in furtherance of Mrs. Kiraly's estate.

"18.  Pursuant to statute, after the court appointed the executor, the executor was required to file an inventory of the estate within 30 days. The executor failed to do so. The Respondent failed to take any action to see that the executor timely filed an inventory of the estate.

"19.  On September 17, 2008, the Respondent filed a petition for appointment of a conservator for the minor devisee. After filing the petition for appointment of a conservator for the minor devisee, the Respondent failed to take any action to complete the conservatorship.

"20.  Liz Bradshaw, one of Mrs. Kiraly's daughters and heirs, attempted to contact the Respondent on a number of occasions to learn the status of her mother's estate. Because the Respondent was not providing Ms. Bradshaw with adequate communication, in 2008, Ms. Bradshaw filed a complaint with the Disciplinary Administrator. In December, 2008, the Respondent responded to the complaint. In January, 2009, the Disciplinary Administrator concluded that the Respondent was not obligated to communicate with Ms. Bradshaw as she was not his client. The Disciplinary Administrator dismissed the complaint.

"21.  Because she found the Respondent to be difficult to contact, because the Respondent did not provide Ms. Bradshaw with adequate communication, and because the estate was not moving along, Ms. Bradshaw retained an attorney, Tom Arnhold, to represent her interests in the estate case.

"22.  Mr. Arnhold filed a motion requiring the executor to file an inventory forthwith. On April 15, 2009, the court entered an order which provided:

'1. That the Executor shall provide to her counsel a signature car[d] and any other information necessary to determine whether or not the bank account of the deceased was in joint tenancy with the Executor.

'2. That within 30 days, the Executor shall file an accounting and a petition for final settlement or show cause why such a petition for final settlement and accounting can not be filed within 30 days.

'3. That the Executor shall file a notice of hearing to determine which claims are valid in this matter.'

"23.  On May 21, 2009, 12 months later, the Respondent finally filed an inventory in Mrs. Kiraly's estate.

"24. On June 29, 2009, the court notified the Respondent that she intended to dismiss the conservatorship filed regarding Michael Kiraly for lack of prosecution. Thereafter, on July 6, 2009, the Respondent kept the action alive by filing a petition for extension of time for appointment of conservator for a minor. However, the Respondent failed to take additional action to establish the conservatorship.

"25. On September 25, 2009, the Respondent filed a petition for final settlement. The Respondent failed to attach an accounting to the petition. In the petition, the Respondent claimed that the real property had passed to the devisee, Michael Kiraly. However, the conservatorship had not been established and the real property remained an estate asset. Further, the Respondent failed to properly publish the petition.

"26. On October 1, 2009, through her attorney, Ms. Bradshaw filed an objection in her mother's estate case. Among other things, Ms. Bradshaw asserted that the Respondent failed to file income tax returns for the estate, the Respondent failed to properly publish the filing of the petition for final settlement, the Respondent's attorneys fees were excessive, and the Respondent billed the estate for responding to Ms. Bradshaw's 2008 disciplinary complaint.

"27. On October 5, 2009, Stephen Kiraly filed an objection to the petition for final settlement.

"28. On October 19, 2009, Theodore Kiraly filed an objection to the petition for final settlement.

"29. On November 3, 2009, Judge Patricia Macke Dick filed a complaint with the Disciplinary Administrator regarding the Respondent's handling of Mrs. Kiraly's estate. At that time, Judge Macke Dick's primary concern was Ms. Bradshaw's allegation that the Respondent billed the estate for responding to a disciplinary complaint.

"30. The Respondent responded to Judge Macke Dick's response. The Respondent admitted billing the estate for responding to a disciplinary complaint. The Respondent characterized the situation as follows:

'. . . Judge Macke Dick proclaimed from the bench that I committed an ethical violation by charging the estate for answering Elizabeth's ethical complaint letter on December 26th, 2008. I believed that the complaint by Ms. Bradshaw was meritless and was only an attempt to attack the estate administration by her sister Lisa Hayes. She had indicated on numerous occasions to her sister that she was going to make this estate drag out as long as possible because she wasn't going to get very much out of the estate.

'As your office concluded, the ethical attack on me as the attorney for the estate was meritless based on the fact that she was not my client and was summarily dismissed. I billed this as work on the estate. I explained to Judge Macke Dick when she asked me why I billed that time to the estate was that "but for" the position as the attorney for the estate there would not have been the contact with Elizabeth Bradshaw leading to her frivolous and

meritless ethical complaint. I explained that it was work on the estate, for the estate, and not personal to David F. Holmes, attorney at law. I also explained to Judge Macke Dick that if the Court wanted to take that billing off that would be fine.'

"31. Following the trial on December 18, 2009, on the second amended petition, on November 17, 2009, the Respondent filed a second amended petition for final settlement. The court took up the Respondent's second amended petition for final settlement on December 18, 2009.

"32. On January 7, 2010, Judge Macke Dick issued a memorandum opinion regarding Mrs. Kiraly's estate. In her memorandum opinion, Judge Macke Dick pointed out a number of problems with Mrs. Kiraly's estate.

'a. *Inventory.* An inventory of the assets should have been filed within 30 days of appointment of the administrator, on approximately May 23, 2008. The Respondent did not file the inventory until May 21, 2009. The inventory filed in Mrs. Kiraly's estate failed to list the real property which was the largest of the estate's assets.

'b. *Servicemembers Civil Relief Act of 2004.* The Respondent indicated that he had complied with the Soldiers and Sailors Civil Relief Act of 1940. However, the Soldiers and Sailors Civil Relief Act of 1940 had been replaced by the Servicemembers Civil Relief Act of 2004. Further, the Respondent failed to either seek the appointment of an attorney to represent the heir who appeared to be in the military or file an affidavit indicating none of the heirs were in the military.

'c. *Conservatorship.* On April 23, 2008, the court informed the Respondent that he needed to establish a conservatorship for the minor devisee. The Respondent filed a petition for appointment of conservator on September 17, 2008. However, the Respondent failed to take action to complete the establishment of the conservatorship. On June 29, 2009, the court notified the Respondent that she intend to dismiss the pending conservatorship case. As a result on July 6, 2009, the Respondent filed a petition for extension of time for appointment of conservator for a minor. However, by January 7, 2010, the Respondent still had not established the conservatorship.

'd. *Petition for Final Settlement.* On September 25, 2009, the Respondent filed a petition for final settlement. The Respondent failed to attach an accounting to the petition. Additionally, in the petition, the Respondent stated that the real estate had been distributed to the minor devisee, Michael Kiraly. However, the order of final settlement is the means that the title to real property is passed by a testamentary document in probate. There was no conservatorship in place and a minor cannot own real property in his own name in Kansas. As of January 7, 2010, [] the house remained as an asset of the estate.

'e. *Publication.* The respondent failed to complete the publication of the original petition for final settlement as required by statute.

'f. *Income Tax Returns.* The Respondent failed to ensure that the executor timely filed income tax returns for the estate.'

"33. The court found that Mrs. Kiraly's estate was a simple estate and should have taken no more than 17 hours of attorneys fees to complete. The court reduced the Respondent's attorneys fees from $9,739.00 to a total of $3,150.00.

"34. On February 1, 2010, the Disciplinary Administrator informed the Respondent that he was in receipt of Judge Macke Dick's January 7, 2010, memorandum decision. The Disciplinary Administrator allowed the Respondent to respond to the claims made in the memorandum decision.

"35. The Respondent simply characterized Judge Macke Dick's order as 'punishing,' 'mean,' and 'extremely punitive.' The Respondent attempted to mitigate the substantive claims included in the memorandum decision by blaming his lack of attention to the estate on the problems with his office, which occurred from February through March 2009, and then for a period of 8 to 9 weeks thereafter. The vast majority of the problems in this case occurred prior to February and March 2009, and persisted long after the Respondent had his office back in order.

"DA10998—Complaint of Juanita Silvey (Bogner Matter)

"36. In 2001, the Court in Harvey County, Kansas, determined that Floyd C. Bogner, Sr., was in need of a conservatorship and guardianship. Mr. Bogner was an elderly man with four adult children.

"37. At some point, the court appointed Juanita Silvey, Mr. Bogner's daughter, to serve as Mr. Bogner's guardian. In 2006, Ms. Silvey moved Mr. Bogner from a nursing home, to Mr. Bogner's residence to live out his life at home.

"38. From the time Mr. Bogner returned to his home, until his death in February, 2008, a period of 14 1/2 months, Ms. Silvey provided care for him. When Ms. Silvey was not available to provide nursing care for her father, she hired nurses to care for her father. Mr. Bogner received 24 hour care in his home.

"39. Ms. Silvey incurred significant financial loss by ensuring that her father was able to live his life out in his home. It appears that by providing for care for her father in his home, Ms. Silvey incurred expenses in the total amount of $87,602.89.

"40. On January 18, 2007, the court appointed the Respondent to serve as the conservator for Floyd C. Bogner. The Respondent was the fifth conservator to be appointed in Mr. Bogner's case. As conservator, the Respondent controlled the distribution of conservatorship funds after 2007. The order appointing the Respondent provided as follows:

'NOW ON THIS 5th day of January, 2007, the above entitled matter comes on for hearing before the Court for the appointment of a Conservator for Floyd Bogner, Sr. There are no appearances.

'THEREUPON, the Court after reviewing the file and all the records in this matter makes the following findings and orders:

'1. IT IS THE FINDING AND ORDER OF THIS COURT that Floyd Bogner Sr. is still in need of a Conservator to handle all his financial matters.

'2. IT IS [THE] FURTHER FINDING AND ORDER OF THIS COURT that David F. Holmes, Attorney at Law, SC#12000, shall be appointed as the Conservator for Floyd Bogner, Sr. to handle all his financial matters.

'3. IT IS [THE] FURTHER FINDING AND ORDER OF THIS COURT that all financial records, checkbooks, cash, or any other financial records shall be given immediately to David F. Holmes at his law office.

'4. IT IS [THE] FURTHER FINDING AND ORDER OF THIS COURT that David F. Holmes shall serve without bond and shall be entitled to compensation for his services at his regularly hourly fee as of January 1st, 2007.'

"41. Ms. Silvey and the Respondent did not agree on the extent to which Ms. Silvey was entitled to reimbursement for the cost of the father's care from conservatorship assets. Ms. Silvey sought reimbursement for expenses she incurred. The Respondent appears to have agreed to pay Ms. Silvey $4,000.00 per month for the care she provided. According to the Respondent, Ms. Silvey's requests were significantly higher than the cost of nursing home care.

"42. Throughout the period that the Respondent served as Mr. Bogner's conservator, the Respondent reimbursed Ms. Silvey only as follows:

| | |
|---|---|
| '7/26/2007 | $10,000.00 |
| 9/6/2007 | $101.30 |
| 9/17/2007 | $4,000.00 |
| 12/12/2007 | $10,000.00 |
| Total reimbursed to Ms. Silvey | $24,101.30' |

Even under the Respondent's own theory of reimbursement, he failed to properly reimburse Ms. Silvey for the expenses she incurred in caring for her father. Had the Respondent reimbursed Ms. Silvey at a rate of $4,000 per month for the 13 months that the Respondent's service as conservator overlapped with Ms. Silvey's service as guardian (from January, 2007, until Mr. Bogner's death in February, 2008), the Respondent would have reimbursed Ms. Silvey a total of $52,000.00.

"43. On November 7, 2007, the court issued an order that included the following provision:

'8. The present conservator, David Holmes, is ordered to determine immediately what expenses the Guardian has accumulated that should be reimbursed by the conservatorship estate and pay such amount to Juanita Silvey.'

Despite the court's clear order, the Respondent failed to reimburse the guardian for the expenses she incurred in providing for Mr. Bogner's care. Rather, following the court's November, 2007, order, on December 12, 2007, the Respondent simply paid Ms. Silvey $10,000.00 toward the amounts she had previously incurred.

The Respondent noted on that check that it covered October, November, and half of December, 2007, consistent with his agreement that he would pay Ms. Silvey $4,000.00 per month rather than her actual expenses.

"44.   On August 7, 2008, Ms. Silvey filed a petition for allowance and classification of demand in Mr. Bogner's estate case. In that document, Ms. Silvey alleged that she incurred a total of $64,102.89 in unreimbursed expenses for providing for the care of her father, the differen[ce] between the total expenses incurred and the amount previously reimbursed by the Respondent.

"45.   The Respondent paid himself, from conservatorship funds, for his services as conservator as follows:

| 'Date | Amount | Account |
|-------|--------|---------|
| 2/5/2007 | $ 3,115.00 | 6695 (operating) |
| 2/28/2007 | $ 4,500.00 | 6695 (operating) |
| 3/6/2007 | $ 3,500.00 | 6695 (operating) |
| 4/24/2007 | $ 1,500.00 | 6695 (operating) |
| 5/22/2007 | $ 1,500.00 | 6695 (operating) |
| 7/23/2007 | $ 7,500.00 | 6695 (operating) |
| 9/27/2007 | $ 5,000.00 | 6695 (operating) |
| 1/10/2008 | $ 5,000.00 | 6695 (operating) |
| 7/16/2008 | $ 3,500.00 | 6695 (operating) |
| 8/31/2009 | $ 3,500.00 | 6695 (operating) |
| Total advanced to the Respondent | $38,615.00' | |

The Respondent did not seek prior court approval before advancing himself any of the above-listed amounts. The Respondent asserted that he was not required to seek prior court approval, despite the statutory language to the contrary, because on January 18, 2007, the court ordered that the Respondent 'shall serve without bond and shall be entitled to compensation for his services at his regularly hourly fee as of January 1st, 2007.'

"46.   Other than the first payment made, the Respondent did not pay himself for work completed on behalf of the conservatorship. Rather, the Respondent paid himself advanced fees. On five separate occasions, the Respondent prepaid himself so much that the conservatorship had a credit balance with the Respondent exceeding $6,000.00. The highest credit balance that the conservatorship had with the Respondent was $9,901.90.

"47.   The Respondent did not deposit these unearned fees into his attorney trust account. Instead, the Respondent deposited these amounts into his attorney operating account, account ending in 6695. By depositing unearned fees into his attorney operating account, the Respondent commingled his own funds with those of the conservatorship. The Respondent did not retain the unearned fees in his attorney operating account. Rather, the Respondent spent the unearned fees, thus, converting them to his own use.

"48.   After being ordered to reimburse Ms. Silvey for the expenses she incurred in caring for her father, the Respondent paid himself $12,000.00, including

amounts paid following the ward's death in February, 2008 ($5,000.00 on January 10, 2008, $3,500.00 on July 16, 2009, and $3,500.00 on August 31, 2009).

"49.  Throughout the time the Respondent was conservator for Mr. Bogner, the Respondent never made a complete inventory of Mr. Bogner's property. The Respondent simply relied on others to make lists of what they believed to be Mr. Bogner's property.

"50.  The Respondent billed the conservatorship for meeting with Brad Dillon, held in June, 2008, the attorney appointed to investigate a disciplinary complaint filed by Ms. Silvey.

"51.  On October 15, 2008, the court, in a letter decision, appointed the Respondent to serve as the executor of Mr. Bogner's estate. The court directed the Respondent to 'prepare any necessary paperwork to effect this order.' Despite the court's clear language, in the Respondent's Answer to the Formal Complaint, the Respondent asserted that 'Stan Juhnke was the attorney for the estate and was supposed to fill all the documents necessary to have Respondent appointed as administrator.' The Respondent failed to prepare an order appointing himself as the executor of Mr. Bogner's estate as directed by the court.

"52.  On November 18, 2010, Judge Dickinson ruled on a variety of pending motions in a letter decision. The letter provided as follows:

'As you know, I took your motions under advisement following the hearing on October 18, 2010 in order to more thoroughly review the case file, pertinent pleadings, and legal authority. I have now done that, and specifically have reviewed the following pleadings and their exhibits and attachments, including Mr. Holmes' accounting:

1. Motion regarding conservator's time and billing records (Juanita Silvey, 2-19-10)

2. Motion for non-approval of accounting (Lloyd Bogner, 3-1-10)

3. Second motion regarding conservator's time and billing records (Juanita Silvey, 3-1-10)

4. Petitioner's objections to conservator's accounting, and memorandum regarding conservator's breach of fiduciary duty (Juanita Silvey, 4-12-10)

5. Conservator's response to Juanita Silvey and Lloyd Bogner's objections to conservatorship accounting and alleged breach of fiduciary duty (David Holmes, May 19, 2010)

6. Mr. Miller's October 20, 2010 letter

7. Mr. Holmes' October 26, 2010 letter

8. Mr. Holmes' October 27, 2010 letter

'I have also reviewed K.S.A. 59-1717 and *In re Alig*, 285 Kan. 117 (2007), cited by Mr. Miller concerning Mr. Holmes attorneys' fees.

'The primary issue revolves around attorneys' fees and an alleged breach of fiduciary duty by the conservator. K.S.A. 59-1717 provides the authority for payment to a fiduciary for compensation for services and those of his or her attorneys as shall be just and reasonable. "At any time during ad-

ministration the fiduciary may apply to the court for an allowance upon his or her compensation and upon attorneys fees."

'The facts concerning attorneys' fees are not in dispute. Mr. Holmes, as conservator, paid himself advances on fees for his work as conservator, citing both Rule 1.5 in the Professional Code of Conduct and my order stating the conservator "shall be entitled to compensation for his services at his regularly hourly fee as of January 31, 2007." His hourly rate was $150.

'In retrospect, in light of the complaints lodged by Ms. Silvey and Mr. Lloyd Bogner regarding attorneys' fees, the better practice would have been for Mr. Holmes to seek prior court approval by application to the court. Mr. Holmes felt he had prior authorization from the court to pay himself by virtue of the above referenced order. Considering the combination of the delay in filing the accountings showing attorneys' fees, and the security of funds to pay Ms. Silvey for her expenses[, i]t is easy to understand Ms. Silvey's objections to Mr. Holmes' advance payments versus her non-reimbursement for her expenses as guardian.

'Ms. Silvey seeks a refund of attorneys' fees on the grounds that the fees were not reasonable, were not approved by the court and were excessive, due in part to Mr. Holmes' failure to negotiate, and that fees were paid after the death of Mr. Bogner at a time when the conservatorship should have been closed. It is also true, as Mr. Miller points out, that I had ordered the payment of Ms. Silvey's expenses on November 7, 2007, and that my intention was for Ms. Silvey to be paid forthwith.

'In reviewing Mr. Holmes' itemization of this time spent on the case, I cannot find that his time was excessive or that his rate of $150 per hour was too high. I have no reason to think he did not incur the time he billed for, and I understand why he felt he had prior authorization to pay himself given my order. While Ms. Silvey's objections could have been avoided had the court approved attorneys' fees prior to each payment, ultimately, Mr. Holmes was entitled to be compensated for his work. There are obvious difficulties in second-guessing the amount of time spent on a case and despite Ms. Silvey's objections, I am not satisfied that given the amount of acrimony and litigation throughout the case that his fees were excessive. While saying that, I am mindful that if one were to add-up all the attorneys' fees spent to date, by all parties, the legal costs probably exceeded the costs of care for Mr. Bogner. I can't think of another case in my experience as a lawyer and judge where so much money was spent while accomplishing so little. This is just a general observation and not an indictment of Mr. Holmes or his billing. The fees, for all concerned, have been excessive in that respect, and that is due to the inability of Mr. Bogner's children to agree on anything. There were allegations of stealing, lying, and cheating. There was a bankruptcy filing, disputes over irrigation pumps, cars, four wheelers, bad check, bad leases, just to name a few of the issues. In addition to the children's own chaos and claims, Mr. Holmes' office was closed first due

to a fire and then due to a hostage situation, including tear gas bombs. This, no doubt, contributed to the delay in filing the accountings and accomplishing an inventory. Despite this turmoil, efforts were made by Mr. Holmes to negotiate selling the assets to the siblings, as well as attending to other duties as conservator. I find no breach of his fiduciary duty to Mr. Bogner.

'As for payment after Mr. Bogner's death, Mr. Holmes' explanation concerning Mr. Greever's issue is adequate to explain the ongoing time requirements.

'While finding Mr. Holmes should not be required to repay attorneys fees, I will not approve any additional expenditures for his work on the conservatorship. He has been adequately compensated from the fees paid to day.

'The accountings are approved and the conservatorship can be closed, and any remaining issues resolved through the decedent's estate, including Ms. Silvey's claims for payment. I have no doubt that Ms. Silvey provided quality care for her father and that she should be reimbursed for the expense involved. It is unfortunate that litigation expenses depleted the funds that should have been available for Mr. Bogner's care.

'No further journal entry is necessary and Mr. Holmes is allowed to withdraw on both the conservatorship and the estate case. I am open to suggestions as to who should be appointed to help finalize both cases.'

"53.    After the court issued its letter decision quoted above, on November 29, 2010, counsel for Ms. Silvey filed a motion to alter or amend judgment. In that pleading, counsel pointed out that based upon the list of items the court reviewed, it appeared that the court failed to review the reply to the response to the objections to the accounting. Further, counsel for Ms. Silvey argued that the court misapplied the law. Counsel argued that 'Kansas law makes no provision for pre-authorization or pre-approval of fees. K.S.A. 59-1717 requires application to the court for approval of fees. That did not occur.'

"54.    From a review of the entire record, it is unclear what action, if any, the court took as a result of Ms. Silvey's motion to alter or amend judgment.

"DA11055—Complaint of Myndee Reed (Goering Matter)

"55.    In December, 2007, Ruth Goering retained the Respondent to represent her in an ongoing dispute with her son, Clare Goering, and his wife, Rhonda Goering, over real property. During the course of the representation, Ruth Goering paid the Respondent a total of $14,000 for the representation. The Respondent received the attorneys fees prior to earning the fees. However, the Respondent failed to deposit the unearned fees into his attorney trust account. Rather, the Respondent deposited the unearned fees into his attorney operating account and into his personal account and the Respondent received cash for a portion of Ruth Goering's unearned attorney fees as detailed below:

| Date | Amount | Account |
|------|--------|---------|
| 12/20/2007 | $1,500.00 | 6695 (operating) |
| 4/21/2008 | $7,500.00 | 0048 (personal) |
| 10/9/2008 | $5,000.00 | 0048 (personal and cash)' |

The Respondent commingled his personal funds with unearned attorneys fees. The Respondent spent the unearned attorneys fees prior to earning them, thus converting the fees to his own use.

"56.   After becoming concerned regarding her erratic behavior, on December 11, 2008, Clare Goering filed an involuntary conservatorship case regarding his mother. Myndee M. Reed represented Mr. Goering in the action. Ruth Goering retained the Respondent to represent her. The Respondent entered his appearance and filed an objection to the proceeding. The Respondent alternatively argued that he should be appointed as the conservator as he already held a durable power of attorney.

"57.   During the course of the representation in the involuntary conservatorship case, Ruth Goering paid the Respondent a total of $12,000.00 in attorney fees. Again, the Respondent failed to deposit the unearned fees into his attorney trust account. Again, the Respondent deposited the fees into his attorney operating account and personal account as follows:

| 12/17/2008 | $3,500.00 | 6695 (operating) |
|------------|-----------|------------------|
| 1/22/2009 | $3,500.00 | 0048 (personal) |
| 5/15/2009 | $5,000.00 | 6695 (operating)' |

The Respondent commingled his personal funds with unearned attorneys fees. The Respondent spent the unearned attorneys fees prior to earning them, thus, converting the fees to his own use.

"58.   On February 4, 2009, the court appointed the First National Bank of Hutchinson as temporary conservator to gather and conserve assets. Additionally, the court ordered the Respondent to take no further action pursuant to his durable power of attorney.

"59.   On May 21, 2009, the court held a trial in the involuntary conservatorship. The court concluded that Ruth Goering was in need of a conservator. The court appointed David E. (Rick) Roberts as conservator.

"60.   After the court concluded that Ruth Goering was in need of a conservator, the Respondent continued to represent Ms. Goering in the land dispute case. According to the Respondent's time records, at the time the court appointed a conservator, Ms. Goering had a credit balance with the Respondent on the land dispute case of $5,392.00. Eventually, the Respondent paid the conservator only $1,000 for unearned attorney fees.

"61.   On September 22, 2009, the court clarified its previous order declaring that all assets of Ruth Goering were to be included in the conservatorship and were to be managed by the conservator. The court's order also included the following language:

'2.   The Court orders David Holmes to provide/deliver to David E. (Rick) Roberts, at his law office located at 216 West 2nd, Hutchinson, Kansas, no later than the close of business on Friday, 25 September 2009, the following information/documentation:

A.   The complete file maintained by Mr. Holmes and his law office with respect to RN 08CV406.

B.   Confirmation of the actual deposit issued to David Holmes by Ruth Goering on or about 17 December 2008, in the amount of "$35,000.00" [sic].

C.   Complete copies of any unpaid billing statements applicable to Ruth Goering.

D.   Complete copies of all billing statements previously submitted to Ruth Goering.

E.   All properties, assets, documents and the like in which Ruth Goering is the owner and/or in which Ruth Goering has any ownership interest which is in Mr. Holmes' possession and/or control.

F.   An accounting of Ruth Goering's assets in which Mr. Holmes' already has control and/or in which Mr. Holmes' has an awareness as being in the possession of any third party.

. . . .

'4.   Mr. Holmes' representation of Ms. Goering in RN 08CV406, ceased as of the date the Conservatorship Journal Entry entered by the Court in RN 08PR223 as the litigation, and the responsibility therefore, in RN 08CV406, in its entirety is an asset of the Conservatorship estate and the control of said litigation became totally vested with the Conservator as of the date the Conservatorship Journal Entry was entered.

'5.   The Court further finds that in the event the Conservator requires legal services for the benefit of Ruth Goering, the Conservator, as a licensed Kansas attorney, can act in that capacity or, in the Conservator's discretion, obtain legal services from other legal counsel.'

"62.   On December 23, 2009, Clare Goering filed a petition for the appointment of a guardian. On March 11, 2010, the court ordered that Mr. Goering serve as his mother's guardian.

*"Respondent's Personal Financial Situation*

"63.   At the time he was taking advance fees from Ms. Goering and the Bogner conservatorship, the Respondent had a personal need to advance himself the funds. In early 2007, the Respondent filed for the protections of the bankruptcy laws. The bankruptcy court approved the Respondent's chapter 13 plan and in March or April, 2007, the Respondent began making $2,800.00 monthly payments to the bankruptcy trustee.

"64.   On February 28, 2007, the Respondent deposited $4,500.00 and on March 6, 2007, the Respondent deposited $3,500.00 from the Bogner conservatorship into his operating account. At the time the Respondent advanced himself

those fees he had not earned them. According to the Respondent's time records, the Respondent did not earn the February 28, 2007, payment until some time in May, 2007, and did not earn the March 6, 2007, payment until some time in July, 2007. There was no legitimate reason for the Respondent to advance himself those fees.

"65. From a review of the Respondent's bank records, however, the reason the Respondent advanced himself those fees becomes clear. The unearned fees did not remain in the Respondent's attorney operating account waiting to be drawn after earned. The Respondent spent the proceeds from the February 28, 2007, and March 6, 2007, deposits on personal and professional expenses. By March 9, 2007, the balance in the Respondent's operating account was $933.28.

"66. On April 23, 2007, the Respondent made the April payment to his bankruptcy trustee in the amount of $2,800.00 from his attorney operating account. On April 24, 2007, the Respondent advanced himself $1,500.00 from the Bogner conservatorship and deposited the proceeds into his attorney operating account. Following that deposit, the next day, the balance in the Respondent's operating account was only $326.52. Clearly, had the Respondent not advanced himself the $1,500.00 from the Bogner conservatorship account, the Respondent's operating account would have been overdrawn from personal and professional obligations.

"67. On May 22, 2007, the Respondent again advanced himself $1,500 from the Bogner conservatorship. Immediately, the Respondent's operating account balance was less than the $1,500.00 deposit. After receiving credit for the $1,500.00 deposit from the Bogner conservatorship, on May 23, 2007, the Respondent's attorney operating account had a balance of only $1,375.84.

"68. On July 23, 2007, the Respondent advanced himself $7,500.00 from the Bogner conservatorship. After the Respondent deposited that check into his attorney operating account, the Bogner conservatorship had a credit balance of $9,329.80 according to the Respondent's own time records. That same day, the Respondent wrote himself a check in the amount of $3,800.00, drawn on his attorney operating account. That check was deposited into the Respondent's personal account, account number ending in 0048. After the Respondent's deposit of $7,500.00 from the Bogner conservatorship and after the $3,800.00 check made payable to himself, the balance of the Respondent's operating account, on July 23, 2007, was just $5,404.48.

"69. On September 27, 2007, the Respondent advanced himself $5,000.00 from the Bogner conservatorship. That advanced fee increased the Bogner conservatorship's credit with the Respondent to its highest level, $9,901.90. At the same time, Ms. Silvey had incurred approximately $36,000.00 in expenses in caring for her father, according to the Respondent's agreement regarding reimbursement. However, by September 27, 2007, Ms. Silvey had been reimbursed only $14,101.30 for caring for her father on a full-time basis. The $9,901.90 would have gone a long way toward reimbursing Ms. Silvey for the actual expenses she incurred in caring for Floyd C. Bogner, Sr.

"70.   Even though the Respondent deposited $5,000.00 of the Bogner conservatorship funds into his attorney operating account on September 27, 2007, by September 28, 2007, the balance in the Respondent's operating account was only $3,879.45.

"71.   On January 10, 2008, the Respondent advanced himself $5,000.00 from the Bogner conservatorship and deposited the funds into his attorney operating account. By advancing himself $5,000.00, the Respondent brought the Bogner conservatorship credit balance to $8,325.58. On that same day, January 10, 2008, the Respondent wrote himself a $3,000.00 check drawn on his attorney operating account. The Respondent deposited the $3,000.00 check into his personal checking account. By January 18, 2008, the balance in the Respondent's operating account was only $481.22, while the Bogner conservatorship's credit balance with the Respondent stood at $8,100.58.

"72.   The January 10, 2008, deposit of $3,000.00 into the Respondent's personal checking account brought his balance to $3,410.64. However, on January 15, 2008, a $1,791.46 check cleared the Respondent's personal checking account, leaving a balance of $1,215.96.

"73.   On April 21, 2008, the Respondent sought and obtained an advance fee of $7,500.00 from Ms. Goering. The Respondent deposited the advanced fee directly into his personal checking account. After the Respondent deposited Ms. Goering's $7,500.00 into his personal checking account, the Respondent's personal checking account had a balance of $11,211.43. The following week the Respondent traveled to Las Vegas, Nevada, and his April, 2008, bankruptcy payment was withdrawn from his personal checking account. By May 1, 2008, the balance in the Respondent's personal checking account was $4,149.79. At that same time, Ms. Goering had a credit balance with the Respondent in the amount $7,427.00.

"74.   On July 14, 2008, following Mr. Bogner's death, the Respondent advanced himself $3,500.00 in fees from the Bogner conservatorship and deposited the same into his attorney operating account. Within the next three days, the Respondent had written himself checks, drawn on his attorney operating account, totaling $8,000.00. The Respondent deposited the proceeds from the checks into his personal checking account. By July 23, 2008, the balance of the Respondent's attorney operating account was only $517.15. In July, 2008, the Respondent traveled to Las Vegas, Nevada, for the second time in three months. The Respondent spent at least $3,000.00, in Vegas.

"75.   On October 9, 2008, the Respondent sought and obtained an advance fee of $5,000.00 from Ms. Goering. The Respondent prepared a deposit slip for his personal checking account. The Respondent deposited $3,500.00 of Ms. Goering's check and received the remaining $1,500.00 in cash. By October 16, 2008, the balance in the Respondent's personal checking account was just $1,773.49. At the time the Respondent required the October 9, 2008, advanced fee from Ms. Goering, the Respondent should have been holding $8,717.00 for Ms. Goering.

However, it appears that the Respondent had previously spent Ms. Goering's advanced fees.

"76.   On December 17, 2008, the Respondent sought and obtained an advance fee from Ms. Goering in the amount of $3,500.00. The Respondent deposited the $3,500.00 into his attorney operating account. The next day, the Respondent wrote himself a $2,000.00 check from his attorney operating account. Additionally, within six days, the balance of the Respondent's attorney operating account was down to $123.30.

"77.   On August 28, 2009, more than 18 months following Mr. Bogner's death, the Respondent advanced himself $3,500.00 from the Bogner conservatorship. The Respondent deposited the fees into his attorney operating account. By September 21, 2009, the balance in the Respondent's attorney operating account was $174.67.

"78.   Clearly, the Respondent used the advanced fees that he took from the Bogner conservatorship and that he received from Ms. Goering to pay his personal and professional expenses.

## "CONCLUSIONS OF LAW

"1.   Based upon the findings of fact, the Hearing Panel concludes as a matter of law that the Respondent violated KRPC 1.3, KRPC 1.5, KRPC 1.15, KRPC 3.2, KRPC 8.4(c), and KRPC 8.4(g), as detailed below.

"2.   KRPC 1.5 provides that '[a] lawyer's fee shall be reasonable.' The Court in the Kiraly case found that the Respondent's fee was unreasonable. While the Court in the Bogner case did not find that the Respondent's fee was unreasonable, the Respondent has, nonetheless stipulated that his fees in the Kiraly matter, the Bogner matter, and the Goering matter were unreasonable. As such, the Hearing Panel concludes that the Respondent violated KRPC 1.5 by charging unreasonable fees.

"3.   Lawyers must properly safeguard the property of their clients and third persons. Properly safeguarding the property of others necessarily requires lawyers to deposit unearned fees into an attorney trust account. The Respondent systematically failed to utilize his attorney trust account. The Respondent failed to deposit the fees paid by Ms. Hayes into his attorney trust account. Additionally, the Respondent failed to deposit the unearned fees in the Bogner conservatorship into his attorney trust account. Finally, the Respondent failed to deposit the unearned fees paid by Ms. Goering into his attorney trust account. Accordingly, the Hearing Panel concludes that the Respondent violated KRPC 1.15(a) by failing to deposit unearned fees, thus, the property of others, into his attorney trust account.

"4.   The Respondent likewise violated KRPC 1.15 by commingling his funds with his clients' funds and third persons' funds. Specifically, the Respondent violated KRPC 1.15(d) by commingling his funds with Ms. Hayes' funds, Bogner conservatorship funds, and Ms. Goering's funds. As such, the Hearing Panel concludes that the Respondent violated KRPC 1.15(d).

"5.   Finally, the Respondent violated KRPC 1.15(a) by converting the property of his clients and of third persons to his own use. The Respondent repeatedly sought and received advanced fees from the Bogner conservatorship and Ms. Goering. With the exception of the first payment made by the Bogner conservatorship, all the payments were advance fee payments. Despite the fact that the Respondent had not yet earned the fees, he immediately converted the fees to his own use and spent the funds on personal and professional expenses, including his monthly bankruptcy payment and two trips to Las Vegas, Nevada. As a result, the Hearing Panel concludes that the Respondent violated KRPC 1.15(a) by converting the funds of clients and third persons to his own use.

"6.   An attorney violates KRPC 3.2 if he fails to make reasonable efforts to expedite litigation consistent with the interests of his client. The Respondent stipulated that he violated KRPC 3.2, with regard to his representation of Ms. Kiraly's estate and Mr. Bogner's conservatorship. The Respondent failed to make reasonable efforts to expedite Ms. Kiraly's estate and Mr. Bogner's conservatorship. A review of the evidence before the Hearing Panel clearly established significant delay attributable to the Respondent. Accordingly, the Hearing Panel concludes that the Respondent violated KRPC 3.2.

"7.   'It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation.' KRPC 8.4(c). The Respondent engaged in conduct that involved dishonesty when he systematically obtained advanced fees from the Bogner conservatorship and Ms. Goering and used those advanced fees to cover his personal and professional expenses. It is dishonest to convert the property of another to your own use. It is no defense to conversion that, later, you earned the converted money. As such, the Hearing Panel concludes that the Respondent violated KRPC 8.4(c).

"8.   'It is professional misconduct for a lawyer to . . . engage in any other conduct that adversely reflects on the lawyer's fitness to practice law.' KRPC 8.4(g). The Respondent stipulated that he violated KRPC 8.4(g) with regard to Ms. Duncan, the Bogner conservatorship, and Ms. Goering. First, the Respondent engaged in conduct that adversely reflects on his fitness to practice law when he filed a garnishment against Ms. Duncan prior to the time within which she believed that she had to pay the judgment. The Respondent failed to dispute the written confirmation of understanding that Ms. Duncan provided. Rather, the Respondent proceeded, full-steam ahead, to garnish Ms. Duncan's wages from the bank where she was employed which also happened to hold her accounts. Additionally, converting property of a client or a third person is also evidence of misconduct that adversely reflects on the Respondent's fitness to practice law. The Hearing Panel concludes that the Respondent violated KRPC 8.4(g) with respect to Ms. Duncan, the Bogner conservatorship, and Ms. Goering.

"AMERICAN BAR ASSOCIATION<br>"STANDARDS FOR IMPOSING LAWYER SANCTIONS

"In making this recommendation for discipline, the Hearing Panel considered

the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"*Duty Violated.* The Respondent violated his duty to the legal profession to refrain from engaging in misconduct, to his clients to properly safeguard their property, to his clients to charge reasonable fees, and to the public to maintain his personal integrity.

"*Mental State.* The Respondent knowingly and intentionally violated his duties.

"*Injury.* As a result of the Respondent's misconduct, the Respondent caused actual injury to Ms. Duncan, the Kiraly estate, the Bogner conservatorship, Ms. Silvey personally, and Ms. Goering.

"*Aggravating or Mitigating Factors.* Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following aggravating factors present:

"*Prior Disciplinary Offenses.* The Respondent has previously been disciplined on 6 occasions.

'1.   On May 24, 1988, the Disciplinary Administrator informally admonished the Respondent.

'2.   On August 9, 1993, Disciplinary Administrator informally admonished the Respondent.

'3.   On March 27, 2002, the Disciplinary Administrator informally admonished the Respondent.

'4.   On February 13, 2006, the Disciplinary Administrator informally admonished the Respondent for violating KRPC 1.15.

'5.   On February 14, 2007, the Disciplinary Administrator informally admonished the Respondent.

'6.   Finally, on January 13, 2010, the Disciplinary Administrator informally admonished the Respondent for violating KRPC 1.3, KRPC 1.4, and KRPC 1.5.'

"*Dishonest or Selfish Motive.* The Respondent converted the property of others to his own use. Converting property is a dishonest and selfish act. The Respondent's motivation was clearly motivated by dishonesty and selfishness.

"*A Pattern of Misconduct.* The Respondent engaged in a pattern of misconduct—four separate complaints were presented. Some of the misconduct in each case was similar. Additionally, the Respondent engaged in a pattern of misconduct within the Bogner conservatorship case and his representation of Ms. Goering by continuously converting advanced fees.

"*Multiple Offenses.* The Respondent violated KRPC 1.3, KRPC 1.5, KRPC 1.15, KRPC 3.2, and KRPC 8.4. Thus, the Hearing Panel concludes that the Respondent committed multiple offenses.

"*Submission of False Evidence, False Statements, or Other Deceptive Practices During the Disciplinary Process.* In his answer to the formal complaint, the Respondent asserted that only Liz Bradshaw filed an objection to the petition for final settlement. However, three heirs filed objections. On October 1, 2009, Liz Bradshaw filed an objection. On October 5, 2009, Stephen Kiraly filed an objection to the final settlement petition. On October 19, 2009, Theodore Kiraly objected to final settlement.

"Additionally, the Respondent submitted false evidence during the disciplinary process when he testified that Ms. Silvey committed 'fraud' and 'lied to the court' by submitting a claim against her father's estate that failed to account for the $24,000.00 that the Respondent reimbursed her. Ms. Silvey clearly accounted for the fees that she was reimbursed. Ms. Silvey included the following language in two places on the first page of her petition, '[t]he Estate is entitled to the following setoff.' The language is followed by two amounts $16,596.70 and $6,903.03, which total $23,500.00. Ms. Silvey indicated that she continued to hold $601.30 in an account which she held to benefit her father.

"*Vulnerability of Victim.* Ms. Duncan, Ms. Silvey, and Ms. Goering were vulnerable to the Respondent's misconduct.

"*Substantial Experience in the Practice of Law.* The Kansas Supreme Court admitted the Respondent to the practice of law in 1985. The Respondent has substantial experience in the practice of law.

"Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following mitigating circumstances present:

"*Personal or Emotional Problems if Such Misfortunes Have Contributed to Violation of the Kansas Rules of Professional Conduct.* The Respondent has been treated for cancer, the Respondent's wife was treated for cancer, the Respondent's staff and others were held hostage in his office, the police bombed his office with tear gas in order to get the gunman out of the office, and then his temporary office burned. Clearly the destruction of the Respondent's office on two occasions, separated by five weeks, contributed to the Respondent's inability to timely meet the demands of his practice for that period of time. However, much of the misconduct in these cases occurred prior to the misfortunes associated with the Respondent's physical office.

"*The Present and Past Attitude of the Attorney as Shown by His or Her Cooperation During the Hearing and His or Her Full and Free Acknowledgment of the Transgressions.* The Respondent stipulated to a majority of the violations alleged by the Disciplinary Administrator. Accordingly, the Hearing Panel considers the Respondent's cooperation as a mitigating factor.

"*Previous Good Character and Reputation in the Community Including Any Letters from Clients, Friends and Lawyers in Support of the Character and General Reputation of the Attorney.* The Respondent's good character was evidenced by several letters received and reviewed by the Hearing Panel.

"*Remorse*. The Respondent expressed remorse for having engaged in the stipulated misconduct.

"*Remoteness of Prior Offenses*. The records provided by the Disciplinary Administrator do not specify the rule violations in the 1988 informal admonition, 1993 informal admonition, 2002 informal admonition, and the 2007 informal admonition. Thus, it is unknown whether the misconduct in those cases is remote in character to the misconduct in this case. Clearly, however, the misconduct that resulted in the 1988 informal admonition, the 1993 informal admonition, and the 2002 informal admonition are remote in time to the misconduct in this case.

"In addition to the above-cited factors, the Hearing Panel has thoroughly examined and considered the following Standards:

'4.11    Disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client.

'4.12    Suspension is generally appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client.

'4.62    Suspension is generally appropriate when a lawyer knowingly deceives a client, and causes injury or potential injury to the client.

'7.2    Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional, and causes injury or potential injury to a client, the public, or the legal system.'

## "RECOMMENDATION

"The Disciplinary Administrator recommended that the Respondent be indefinitely suspended. The Respondent requested that he be placed on probation, pursuant to Kan. Sup. Ct. R. 211(g). That rule provides:

'(1)    If the Respondent intends to request that the Respondent be placed on probation for violating the Kansas Rules of Professional Conduct or the Kansas Supreme Court Rules, the Respondent shall provide each member of the Hearing Panel and the Disciplinary Administrator with a workable, substantial, and detailed plan of probation at least ten days prior to the hearing on the Formal Complaint. The plan of probation must contain adequate safeguards that will protect the public and ensure the Respondent's full compliance with the disciplinary rules and orders of the Supreme Court.

'(2)    If the Respondent provides each member of the Hearing Panel and the Disciplinary Administrator with a plan of probation, the Respondent shall immediately and prior to the hearing on the Formal Complaint put the plan of probation into effect by complying with each of the terms and conditions of the probation plan.

'(3)    The Hearing Panel shall not recommend that the Respondent be placed on probation unless:

(i)    the Respondent develops a workable, substantial, and detailed plan of probation and provides a copy of the proposed plan of pro-

bation to the Disciplinary Administrator and each member of the Hearing Panel at least ten days prior to the hearing on the Formal Complaint;

    (ii)  the Respondent puts the proposed plan of probation into effect prior to the hearing on the Formal Complaint by complying with each of the terms and conditions of the probation plan;

    (iii)  the misconduct can be corrected by probation; and

    (iv)  placing the Respondent on probation is in the best interests of the legal profession and the citizens of the State of Kansas.'

Thus, in order to recommend that the Respondent be placed on probation, the Hearing Panel must conclude (1) that the Respondent developed a workable, substantial, and detailed plan of probation and provided a copy of the proposed plan of probation to the Disciplinary Administrator and each member of the Hearing Panel at least ten days prior to the hearing on the Formal Complaint, (2) that the Respondent put the proposed plan of probation into effect prior to the hearing on the Formal Complaint by complying with each of the terms and conditions of the probation plan, (3) that the misconduct can be corrected by probation, and (4) that placing the Respondent on probation is in the best interests of the legal profession and the citizens of the State of Kansas.

    "In this case, the Respondent developed a workable, substantial, and detailed plan of probation, he provided a copy of the proposed plan of probation to the Disciplinary Administrator and each member of the Hearing Panel at least ten days prior to the hearing on the Formal Complaint, and he put the proposed plan of probation into effect prior to the hearing on the Formal Complaint. However, the misconduct cannot be corrected by probation. The Respondent, through counsel, argued before the Hearing Panel, that his handling of funds and advancement of attorney fees was 'sloppy' and the result of 'bad judgment' and 'mismanagement.' The Respondent further argued that his conduct was not the result of dishonesty. It is the belief of the Hearing Panel that the evidence in this matter clearly indicates otherwise. The Respondent engaged in intentional conduct which involves dishonesty, misrepresentation, fraud or deceit. Conduct that includes a dishonest element cannot be corrected by probation. The plan developed by the Respondent would not prevent the Respondent from converting the property of others to his own use. Further, it is not in the best interests of the of the legal profession and the citizens of the State of Kansas for the Respondent to be placed on probation in this case.

    "Based upon the findings of fact, conclusions of law, and the Standards listed above, the Hearing Panel unanimously recommends that the Respondent be indefinitely suspended from the practice of law.

    "Costs are assessed against the Respondent in an amount to be certified by the Office of the Disciplinary Administrator."

## DISCUSSION

In a disciplinary proceeding, this court considers the evidence,

the findings of the disciplinary panel, and the arguments of the parties and determines whether violations of KRPC exist and, if they do, what discipline should be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Foster*, 292 Kan. 940, 945, 258 P.3d 375 (2011); see Supreme Court Rule 211(f) (2010 Kan. Ct. R. Annot. 327). Clear and convincing evidence is " 'evidence that causes the factfinder to believe that "the truth of the facts asserted is highly probable." ' " *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009) (quoting *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 [2008]).

The respondent filed no exceptions to the hearing panel's final hearing report. As such, the findings of fact are deemed admitted. Supreme Court Rule 212(c), (d) (2010 Kan. Ct. R. Annot. 344). We conclude the hearing panel's findings are supported by clear and convincing evidence. Thus, the only issue before us is the appropriate discipline.

At the hearing before this court, at which the respondent appeared, the office of the Disciplinary Administrator recommended that the respondent be disbarred. The respondent argued against indefinite suspension and requested that he be suspended and put on probation, according to the probation plan he filed with the office of the Disciplinary Administrator on December 16, 2010, and had in practice since that time.

We decline the respondent's request for suspension and subsequent probation. As the hearing panel noted, the respondent has had extensive contact with the disciplinary process resulting in respondent receiving informal admonishments six times from 1988 to 2010 for complaints involving competence, fees, and lack of communication with clients. When these prior disciplinary offenses are considered along with the respondent's multiple offenses in this case, including violations of Kansas Rules of Professional Conduct 1.3, 1.5, 1.15(a) and (d), 3.2, and 8.4(c) and (g), we find disbarment is the appropriate discipline.

## Conclusion and Discipline

It Is Therefore Ordered that David F. Holmes be disbarred from the practice of law in the state of Kansas, effective on the

filing of this opinion, in accordance with Supreme Court Rule 203(a)(1) (2010 Kan. Ct. R. Annot. 276).

IT IS FURTHER ORDERED that the respondent shall comply with Supreme Court Rule 218 (2010 Kan. Ct. R. Annot. 370).

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to the respondent and that this opinion be published in the official Kansas Reports.